Kevin T. v. Merrimack Valley Sch.    CV-96-485-B   03/05/98

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>**Kevin T., et al.**</u>

    **v.**                                                          C-96-485-B

<u>**Merrimack Valley School District, et al.**</u>

<u>**Kristeen T., et al.**</u>

    **v.**                                                          C-96-516-B

<u>**Merrimack Valley School District, et al.**</u>

<u>**MEMORANDUM AND ORDER**</u>

Kevin T. and Kristeen T. are brother and sister who suffer from lead poisoning and lead-poisoning-induced Attention Deficit with Hyperactivity Disorder ("ADHD").  Both are students at the Loudon Elementary School in Loudon, New Hampshire.  Kevin and Kristeen's school is part of the Merrimack Valley School District (the "District"), the body that exercises administrative control over the school.

Kevin and Kristeen, by and through their mother and next friend Mary L., bring these actions against the District pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1400, <u>et seq.</u> (West 1990 & Supp. 1997), and the corresponding New Hampshire statute, N.H. Rev. Stat. Ann. § 186-

C, et seq. (Michie 1989 & Supp. 1997). Plaintiffs assert that the District violated the IDEA and its New Hampshire counterpart by refusing to find that based on each child's lead poisoning and lead-poisoning-induced ADHD, the children have disabilities entitling each to an individualized education plan ("IEP"). The District now moves for summary judgment against each child.

For the reasons that follow, I deny the District's motion as to each child and find that, as a matter of law, the children are each entitled to an IEP.

## I. FACTS[1]

### A. Kevin T.

#### 1. Substantive History

Kevin was born on July 20, 1989. From approximately May 1992 to October 1992, Kevin and his family resided in an apartment which contained lead-based paint. Tests conducted on Kevin in October 1992 revealed that he had an elevated level of lead in his blood.

In August 1995, William Straughn, a physician at the Dartmouth-Hitchcock Medical Center, examined Kevin regarding his elevated blood-lead level. Dr. Straughn noted in the report he made after examining Kevin that the child suffers from "significant lead poisoning" and that the poisoning was more probably than not caused by the ingestion of paint from the

---

[1] Unless noted otherwise, the following facts are taken from the joint statement of facts submitted by the parties.

-2-

apartment in which Kevin had previously resided.  Dr. Straughn further found that: (1) Kevin's lead poisoning produced "decreased intellectual functioning and problems with focusing and attention, which would carry the diagnosis of attention-deficit disorder with hyperactivity [(i.e., ADHD)];" and (2) as a result of his condition, Kevin would require continued educational, medical, and psychosocial support.

Andrew Saykin and Cynthia Smith, two psychologists at Dartmouth Medical School, also examined Kevin in August 1995. Drs. Saykin and Smith conducted a neuropsychological evaluation of Kevin.  On the achievement test portion of the evaluation, Kevin scored in the average to low average range.  On the intelligence test portion, Kevin scored in the borderline range for verbal IQ with a score of 71; in the low average range for performance IQ with a score of 87; and in the borderline range for his full scale IQ with a score of 77.

From their evaluation, Drs. Saykin and Smith found that Kevin demonstrated "selective deficits that indicate cerebral dysfunction," including: (1) deficits in his expressive language functions, organizational skills, and fine motor skills; and (2) verbal cognitive skills significantly below his nonverbal skills. The Dartmouth psychologists also noted that such deficits as well as certain behavior patterns that Kevin exhibited (including fidgeting, frequently leaving his seat, impulsivity, difficulty inhibiting his behavior, frequently interrupting others, hyperactive behavior, irritability, difficulty following

-3-

instructions, difficulty organizing himself, high level of distractability, and forgetfulness) were generally consistent with a diagnosis of ADHD. They further found that "to a reasonable degree of neuropsychological certainty . . . lead exposure is a substantial factor in accounting for [Kevin's] cerebral dysfunction."

The Dartmouth psychologists concluded that Kevin was at risk for difficulty in completing first grade. They anticipated that he would have difficulty "focusing his attention and containing himself with a large group of children" and predicted that he would experience increasing social dysfunction in school. Consequently, Drs. Saykin and Smith made several recommendations regarding how to address Kevin's condition, including suggestions that: (1) "he should be referred to a learning specialist;" (2) "he should be considered for special education classes;" (3) "his academic performance should be closely monitored and, if necessary, he should receive individual tutoring and be exposed to different types of learning strategies;" (4) "he would benefit from a psychiatric evaluation to consider a trial of psychostimulants for possible treatment of ADHD;" and (5) a neuropsychological reevaluation should be conducted in one year and periodically throughout the remainder of his schooling to "assess for a possible change in functioning."

Kevin began attending Loudon Elementary School as a first grade student in September 1995. He did not attend preschool, nursery school, or Kindergarten prior to beginning at Loudon and

was chronologically younger than some of the children in his class. During the school year, Kevin experienced social and academic difficulties. Although Kevin was not brought in for screening prior to beginning school, he was administered the Early Prevention of School Failure Diagnostic Student Profile evaluation (the "Early Prevention of Failure Evaluation") just after matriculating. On that test, Kevin scored moderately above his age level in expressive language and visual memory; moderately below his age level in receptive language; and at his expected age level in auditory discrimination, fine and gross motor skills, and visual discrimination.

In addition, according to his teacher Jennifer Kusnarowis, Kevin's behavior, social skills, and academic ability at the beginning of the academic year were lower than those of other children. Kusnarowis observed that Kevin: lacked verbal and physical control; appeared frustrated in completing assignments; had social development difficulties; had language skill difficulties; appeared to become physically exhausted each day; took naps in class; had poor peer relations; had erratic learning; had tantrums; had power struggles with the teacher about doing work; and required a high degree of attention from the teacher.[2] By January 1996, Kusnarowis identified Kevin as

---

[2] Kusnarowis's observations are taken from plaintiff's statement of disputed facts. The District does not dispute that Kusnarowis made these observations but notes that Kusnarowis also believed that Kevin's major problems were social and that Kevin's academic problems would fall into place once his behavioral issues were addressed.

being at risk for failing first grade and offered him extra reading help. In February 1996, Kusnarowis noted that Kevin's behavior problems had become worse.

Because of Kevin's social and academic difficulties, in March 1996, Kusnarowis prepared a "Section 504" plan for Kevin, pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West Supp. 1997).[3] She noted in the plan that although Kevin was at grade level in reading and in handwriting (when he focused on the task), he was below grade level in most academic areas. In the plan, Kusnarowis also noted that Kevin: had much difficulty staying on task and completing work on time; had very poor time management skills; and was a very disorganized student. The Section 504 plan contained classroom modifications aimed at helping Kevin improve his social and academic skills. Such modifications included provision of: (1) repeated directions with examples; (2) verbal timelines or countdowns as to how long Kevin had to complete his work; (3) extra time to finish work; (4) frequent monitoring of his work progress; (5) seating away from distractions; (6) extra spelling help; and (7) continued

---

[3] Section 504 of the Rehabilitation Act, which applies broadly to any program or authority receiving federal funds, prohibits public schools that receive federal aid from discriminating against students on the basis of disability. See 29 U.S.C.A. § 794(a), (b)(2)(B). To comply with Section 504, a school must provide disabled students with services "designed to meet [the] individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1)(i) (1997). Schools record the services offered to disabled students in so-called Section 504 plans. See 34 C.F.R. §§ 104.33(b)(1)(ii), 104.35(c)(2), 104.36.

small group reading support from a school reading aide.[4]

Despite the extra attention Kevin received during the year, however, Kevin's first grade report card reveals that he needed extra help with such skills as social learning; listening (including listening attentively, listening with understanding, and listening to directions); and language arts (i.e., speaking, writing, and penmanship skills).  Nevertheless, Kevin was promoted to the second grade.

2.  Procedural History

On September 5, 1995, Mary L. alerted the District to Kevin's elevated blood-lead level via a health history questionnaire furnished by and returned to the Loudon Elementary School nurse.  On October 28, 1995, Mary L. requested that the District establish an Educational Resource Team (the "Team") to evaluate Kevin for special education and related services.  On November 2, 1995, the District scheduled a Team meeting for such a purpose to take place on November 14, 1995.  The Team's members consisted of Catherine Denoncourt (a guidance counselor for the District), Janet Jillete (the District's speech/language pathologist), Nancy Lorenz (the District's learning disabilities diagnostician), Andrew Kyriakoutsakos (the Loudon Elementary School resource room teacher), and Kusnarowis.

The Team met on November 14, 1995.  At the meeting, the Team received the Dartmouth psychologists' report and asked Mary L. to

---

[4]  The contents of Kevin's Section 504 plan are drawn from the parties' statements of disputed facts which are substantially similar in their description of the plan's contents.

obtain a letter from Dr. Straughn memorializing his observations regarding Kevin's condition. The Team decided to order additional achievement, speech and language, and motor skills testing to help in the Team's evaluation of Kevin's situation.

In December 1995, Kevin took the Woodcock-Johnson Basic Reading Test and participated in communication and motor skill evaluations. These tests revealed that Kevin had low average to average reading skills[5], average receptive and expressive language skills, and age-appropriate motor skills[6]. In addition, on December 19, 1995, Team member Kyriakoutsakos observed Kevin in his classroom over a one- to two-hour period of time, finding that: he "had little difficulty focusing on the teacher and her instructions;" could follow two-step directions; and had fine motor skills appropriate for his age.

On January 2, 1996, the Team reviewed the results of these evaluations and concluded that Kevin did not have a specific learning disability, pursuant to 34 C.F.R. § 300.7(b)(10) and N.H. Code of Admin. R. Ed. 1102.31(k), or a speech and language impairment, pursuant to 34 C.F.R. § 300.7(b)(11) and N.H. Code of

---

[5] This information is drawn from the District's statement of disputed facts. Plaintiff's statement does not refute these results but compares them to the results of the Woodcock-Johnson Basic Reading Test administered by the Dartmouth psychologists on which Kevin performed more poorly.

[6] Despite such a result, Linda Curtis, the person who administered the motor skills test, noted that: (1) there was a "significant difference in Kevin's level of cooperation and ability to stay on task" between her two sessions with him; and (2) "it is suspected that had the bulk of the testing not been accomplished on a 'good day,' Kevin would have scored significantly lower" on the tests administered.

Admin. R. Ed. 1102.31(*l*). On February 13, 1996, the Team reviewed a letter from Dr. Straughn in which he stated his opinion that the neuropsychological evaluation performed on Kevin and his own observations indicated the presence of cerebral dysfunction and temperamental differences compatible with ADHD resulting from lead poisoning. The District accepted Dr. Straughn's diagnosis. The Team concluded, however, that because Kevin's lead poisoning and ADHD were not adversely affecting his education, Kevin was not otherwise health impaired, pursuant to 34 C.F.R. § 300.7(b)(8) and N.H. Code of Admin. R. Ed. 1102.31(i), and, therefore, did not need an IEP.

After the District rendered its decision, plaintiff appealed to the New Hampshire Department of Education (the "DOE"). On April 8, 9, 12, and 29, 1996, a DOE hearing officer conducted a due process hearing. As a result of that hearing, the hearing officer found that although Kevin was adversely affected by lead poisoning, there was an insufficient discrepancy between his abilities and his actual achievement to require the District to provide Kevin with an IEP pursuant to the IDEA.

**B.  Kristeen T.**

1.  Substantive History

Kristeen was born on September 4, 1988. From approximately May 1992 to October 1992, Kristeen and her family resided in an apartment which contained lead-based paint. Tests conducted on Kristeen in October 1992 revealed that she had an elevated level of lead in her blood.

Kristeen began attending Loudon Elementary School as a first grade student in September 1994. She did not attend nursery school or Kindergarten prior to beginning at Loudon. Kristeen was chronologically younger than some of the children in her class, and her skill level ranked at the bottom quarter of the class. On the Early Prevention of Failure Evaluation given to Kristeen just before matriculating, she scored considerably below her age level in her receptive and expressive language and auditory skills, and she scored moderately below her age level in her gross motor skills. The examiner observed that Kristeen demonstrated "poor language skills" and "poor auditory memory," and that Kristeen appeared to be lethargic.

During first grade, Kristeen received specialized reading services administered to students who present below-age skill levels on the Early Prevention of Failure Evaluation. According to her teacher Nancy Marden, Kristeen also received "a great deal of extra encouragement, support with directions, and one-to-one instruction." In addition, Kristeen's first grade report card reveals that she needed extra help in all four quarters of the academic year with such skills as working carefully; listening (including listening with understanding and following directions); language arts (including speaking, writing, and penmanship); and math (understanding concepts).

Marden noted, however, in a January 1995 evaluation of Kristeen that, notwithstanding the support with which Kristeen had been provided, Kristeen's language and math skills were areas

of concern and that "due to Kristeen's level of achievement she should be considered at risk of not successfully completing the first grade program in one year."  Further, in a second January 1995 evaluation, Marden expressed concerns about: (1) Kristeen's social and emotional maturity; (2) her absenteeism; and (3) the increased difficulty Kristeen was experiencing in completing her work as the school work became more complex.  Marden echoed these concerns in a third January 1995 evaluation, noting that Kristeen would need to improve in phonetics, sight words, and math to be considered for promotion to the next grade.  Yet, by the end of the academic year, Marden found that Kristeen had made "incredible strides" and, consequently, promoted her to the second grade.

In August 1995, Dr. Straughn examined Kristeen regarding her elevated blood-lead level.  Dr. Straughn noted in the report he made after examining Kristeen that the child suffers from "significant lead poisoning" and that the poisoning was more probably than not caused by the ingestion of lead contained in the apartment in which Kristeen had previously resided.  Dr. Straughn further found that: (1) Kristeen's lead poisoning produced "cerebral dysfunction and temperamental difference compatible with Attention-Deficit Disorder with Hyperactivity [(i.e., ADHD)];" and (2) as a result of her condition, Kristeen would require continued educational, medical, and psychosocial support.

Drs. Saykin and Smith also examined Kristeen in August 1995,

-11-

conducting an evaluation of her neuropsychological health. As part of the evaluation, Kristeen took the Woodcock-Johnson Basic Reading Test, scoring average marks on five subtests, high average on two, low average on one, and borderline on one. From their evaluation, Drs. Saykin and Smith concluded that Kristeen demonstrated "selective deficits that indicate cerebral dysfunction," including: (1) verbal cognitive skills significantly below her nonverbal skills; (2) evidence of Expressive Language Disorder; (3) impaired cognitive abilities in the areas of visual and verbal memory; and (4) attention and fine motor skills consistent with the diagnosis of ADHD. The report prepared by the Dartmouth psychologists also noted that such deficits were generally consistent with the known effects of lead exposure, finding that "to a reasonable degree of neuropsychological certainty . . . lead exposure is a substantial factor in accounting for [Kristeen's] cerebral dysfunction."

Drs. Saykin and Smith's report made several recommendations regarding how to address Kristeen's condition, including suggestions that: (1) "she should be referred to a learning specialist;" (2) "she should be considered for special education classes;" (3) "her academic performance should be closely monitored and, if necessary, she should receive individual tutoring and be exposed to different types of learning strategies;" (4) "she would benefit from a psychiatric evaluation to consider a trial of psychostimulants for possible treatment of ADHD;" and (5) a neuropsychological reevaluation should be

conducted in one year and periodically throughout the remainder of her schooling to "assess for a possible change in functioning."

In September 1995, Kristeen began second grade at Loudon Elementary School. Kristeen's teacher Lynn Bouchard noticed aspects of Kristeen's development which were consistent with ADHD, including inattentiveness. The child's report card for the first half of the academic year reveals that she needed extra help in each quarter with her social learning skills (including organizing and completing tasks on time, and demonstrating responsibility for completing homework) and with her listening skills (including listening attentively and listening with understanding).

As a result of her observations, Bouchard prepared a Section 504 plan for Kristeen containing classroom modifications aimed at helping her with these skills. Such modifications included provision of: (1) repeated directions with examples; (2) verbal timelines or countdowns as to how long Kristeen had to complete her work; (3) extra time to finish work; (4) frequent monitoring of her work progress; and (5) seating away from distractions.[7]

Despite the extra help Kristeen received during the year, Bouchard remained concerned about Kristeen's social learning and listening skills. Throughout the year, Bouchard recorded her

---

[7] The contents of Kristeen's Section 504 plan are drawn from the parties' statements of disputed facts which are substantially similar in their description of the plan's contents.

concerns in written reports. In November 1995, she informed Mary L. by letter that Kristeen needed to better organize her homework and that her failure to hand in homework was an area of concern. Additionally, in a December 1995 report, Bouchard noted that Kristeen needed extra attention in the "social learning" categories of listening attentively, completing work on time, working independently, and attendance, observing that Kristeen "continued to have a tough time focusing and getting her work done."

Bouchard reiterated such concerns in a January 1996 report observing that Kristeen needed improvement in her listening skills especially when directions were being given and that Kristeen's tardiness was having an effect on her organizational skills and her responsibilities generally. In March 1996, Bouchard again wrote to Mary L. to inform her that Kristeen's failure to hand in homework continued to be an area of concern and that Kristeen seemed very tired in class, requiring Bouchard to speak to Kristeen on several occasions about taking her head off her desk.

Even at the end of the academic year, Bouchard remained concerned about Kristeen's social learning and listening skills. Yet, Bouchard felt that Kristeen finished the year at a second grade reading level. In addition, during the course of the year, Bouchard placed Kristeen in the "top reading group" and noted that she was "progressing in all subject areas." Consequently, Bouchard promoted Kristeen to the third grade.

2.  Procedural History

On October 28, 1995, Mary L. requested that the District establish an Educational Resource Team (the "Team") to evaluate Kristeen for special education and related services.  On November 2, 1995, the District scheduled a Team meeting for such a purpose to take place on November 14, 1995.  The Team's members consisted of Denoncourt, Jillete, Lorenz, Kyriakoutsakos, and Bouchard.

The Team met on November 14, 1995, and reviewed Kristeen's class performance, finding that she was performing in the low average range in math and at an average level in other subjects.  At the meeting, the Team decided to order a classroom observation of Kristeen.  Mary L. also advised the Team that Kristeen's physician, Dr. Straughn, had diagnosed her as having ADHD and that she would supply the Team with a letter from Dr. Straughn.

On December 6, 1995, Team member Kyriakoutsakos observed Kristeen in her classroom during a reading and writing assignment, finding that: she was "well behaved," "quiet," and "shy;" had "good peer relationships;" listened attentively to and appeared interested in the story as it was read; and focused on the teacher and the related worksheet without problem.  Kyria-koutsakos concluded that Kristeen's academic skills appeared on grade level.

On February 13, 1996, the Team reviewed an October 26, 1996 letter from Dr. Straughn in which he stated his opinion that the neuropsychological evaluation performed on Kristeen and his own observations indicated the presence of cerebral dysfunction and

-15-

temperamental differences compatible with ADHD resulting from lead poisoning. The District accepted Dr. Straughn's diagnosis. The Team concluded, however, that because Kristeen's lead poisoning and ADHD were not adversely affecting her education, Kristeen was not otherwise health impaired, pursuant to 34 C.F.R. § 300.7(b)(8) and N.H. Code of Admin. R. Ed. 1102.31(i), and, therefore, did not need an IEP.

After the District rendered its decision, plaintiff appealed to the New Hampshire DOE. On May 3 and 16, 1996, a DOE hearing officer conducted a due process hearing. As a result of that hearing, the hearing officer found that although Kristeen was adversely affected by lead poisoning, there was an insufficient discrepancy between her abilities and her actual achievement to require the District to provide Kristeen with an IEP pursuant to the IDEA.

## II.  **STANDARD OF REVIEW**

When a parent is dissatisfied with a school district's treatment of a child with respect to the IDEA, the parent may challenge the district's decision by demanding an impartial due process hearing before the state educational agency. See Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993); 20 U.S.C.A. § 1415(b)(2). If either party disputes the decision of the hearing officer, it may ask for further review in federal district court. See Lenn, 998 F.2d at 1086; 20 U.S.C.A. § 1415(e)(2). In carrying out such review, the district court

reviews the administrative record, takes additional evidence if requested by a party, and "basing its decision on the preponderance of the evidence, . . . grant[s] such relief as the court determines is appropriate." 20 U.S.C.A. § 1415(e)(2); see Lenn, 998 F.2d at 1086.

The requirement that the court review the hearing officer's record "carries with it the implied requirement that due weight shall be given to these proceedings," Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982), and limits the court to conducting "something short of a complete de novo review" of the prior proceedings, G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 945 (1st Cir. 1991). In recognition of the expertise of the administrative agency, the court must carefully consider the hearing officer's findings and endeavor to respond to her resolution of each material issue. See id. at 946; see also Lenn, 998 F.2d at 1087 ("[T]he judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason.").

After such consideration and where supported by sound reasoning, however, the court is "free to accept or reject the [administrative] findings in part or in whole." Town of Burlington v. Department of Educ., 736 F.2d 773, 792 (1st Cir. 1984), aff'd, 471 U.S. 359 (1985). The exercise of such discretion is particularly appropriate where the court, as I do here, reviews not educational policy choices but, rather, whether the hearing officer's rulings of law are in conformity with

-17-

precedential interpretations of the applicable statutes and regulations. See Lenn, 998 F.2d at 1087 (finding that the function of the trial court is "one of involved oversight" of the hearing process, aimed at assessing the "persuasiveness" of the administrative findings) (citing Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990)); cf. Rowley, 458 U.S. at 206-08 (cautioning that courts should not substitute "their own notions of sound educational policy for those of the school authorities which they review" but not limiting courts' ability to review the authorities' legal interpretation of the IDEA) (emphasis added)). I apply these standards in reviewing the issues plaintiffs raise on appeal.[8]

## III. DISCUSSION

The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education." 20 U.S.C.A. § 1400(c); 34 C.F.R. § 300.1 (1997).

---

[8] I note that the case comes before me as a motion for summary judgment. As the Ninth Circuit has observed, however, "[t]hough the parties may call the procedure a 'motion for summary judgment' in order to obtain a calendar date from the . . . court's case management clerk, the procedure is in substance an appeal from an administrative determination, not a summary judgment." Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 (9th Cir. 1995). Because neither side has requested an evidentiary hearing and because there are no genuine issues of material fact in dispute in this case that would require the introduction of additional evidence, I treat the District's motion for summary judgment and plaintiffs' objection to that motion as motions for judgment as a matter of law on the administrative record. See Manchester Sch. Dist. v. Charles M.F., No. CIV. 92-609-M, 1994 WL 485754, at *4 (D.N.H. Aug. 31, 1994).

The primary procedural mechanism for ensuring that this right is fulfilled is through the preparation of an IEP. Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993). Thus, the IDEA requires that an IEP must be prepared for any child that has a disability within the meaning of the act. 20 U.S.C.A. § 1414(a)(5); 34 C.F.R. § 300.342.

The IDEA establishes a two-part test for determining whether a child has a qualifying disability. See 20 U.S.C.A. § 1401(a)(1)(A)(i), (ii); N.H. Rev. Stat. Ann. § 186-C:2(I); 34 C.F.R. § 300.7(a)(1); N.H. Code Admin. R. Ed. 1102.31. First, the child's disability must meet the requirements of one of the listed categories of impairments. See 20 U.S.C.A. § 1401(a)(1)(A)(i); N.H. Rev. Stat. Ann. § 186-C:2(I); 34 C.F.R. § 300.7(a)(1); N.H. Code Admin. R. Ed. 1102.31. Second, "by reason" of having one of the listed impairments, the child must "need special education and related services." 20 U.S.C.A. § 1401(a)(1)(A)(ii); accord N.H. Rev. Stat. Ann. § 186-C:2(I); 34 C.F.R. § 300.7(a)(1); N.H. Code Admin. R. Ed. 1102.31. Once the child is found to have a qualifying disability which gives rise to the need for special education, the school district must develop an IEP for the child, setting forth those services that the child needs to insure she receives a free and appropriate public education. See Roland M., 910 F.2d at 987; 20 U.S.C.A. §§ 1401(20), 1414(a)(5); N.H. Rev. Stat. Ann. §§ 186-C:2(III), 186-C:7; 34 C.F.R. §§ 300.342, 300.346; N.H. Code Admin. R. Ed. 1102.18.

Plaintiffs contend that the hearing officer erred in two respects, namely that: (1) the hearing officer should have found plaintiffs' diagnosis of lead poisoning and lead-poisoning-induced ADHD meets the requirements of one of the listed categories of impairments and, thus, qualifies as a disability for the purposes of receiving IDEA benefits; and (2) the hearing officer should have found that because of plaintiffs' qualifying disability, they need special education and related services. I examine each of plaintiffs' contentions in turn.

A.    **Do Plaintiffs' Have a Qualifying Disability?**

Plaintiffs assert that their impairments qualify as disabilities for the purposes of receiving IDEA benefits because the impairments meet the requirements of several of the listed categories of impairments, including the "other health impairment" ("OHI") category.[9]  See 20 U.S.C.A. § 1401(a)(1)(A)(i); N.H. Rev. Stat. Ann. § 186-C:2(I); 34 C.F.R. § 300.7(a)(1), (b)(8); N.H. Code Admin. R. Ed. 1102.31(i).  Under the OHI category, a child is disabled for the purposes of the IDEA if the child has "limited strength, vitality or alertness, due to chronic or acute health problems such as a heart condition, tuberculosis, rheumatic fever, nephritis, asthma,

_____

[9]  Plaintiffs also argue that their disability meets the requirements of the "specific learning disability" and "traumatic brain injury" categories listed at 34 C.F.R. § 300.7(b)(10) and (12), respectively, and at N.H. Code Admin. R. Ed. 1102.31(k) and (m), respectively.  Because I find that plaintiffs' disability meets the requirements of the OHI category, see discussion infra, I need not decide whether the disability meets the requirements of these other categories as well.

sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia, or diabetes that adversely affects a child's educational performance." 34 C.F.R. § 300.7(b)(8) (emphasis added); accord N.H. Code Admin. R. Ed. 1102.31(i).

To establish that plaintiffs' diagnosis meets the requirements of the OHI category, they must show that: (1) they have been diagnosed with one of the health problems either expressly or implicitly included among the impairments listed under the OHI category; (2) their impairments limit their strength, vitality, or alertness; and (3) their educational performance is adversely affected as a result.

The District does not dispute that plaintiffs have been diagnosed with lead poisoning and lead-poisoning-induced ADHD or that these health problems are either expressly or implicitly included among the impairments listed under the OHI category. See 34 C.F.R. § 300.7(b)(8) (expressly listing lead poisoning as a health problem); N.H. Code Admin. R. Ed. 1102.31(i) (same); Letter to Williams, 21 Indiv. with Disabilities Educ. Law Rep. ("IDELR") 73 (OSEP 1994) (finding that attention deficit disorders implicitly qualify as health problems under the OHI category). Nor does the District dispute that plaintiffs' impairments limit their alertness. Consequently, I focus on the question of whether plaintiffs have shown that their impairments adversely affect their educational performance so that they should be considered to have a qualifying disability.

1.  Did the Hearing Officer Apply the Correct Legal
    Standard?

At the due process hearing, the District argued, and the
hearing officer agreed, that plaintiffs' impairments do not
adversely affect their educational performance to a significant
enough degree for the children to be considered to have a
qualifying disability that would entitle them to receive special
education under the IDEA. With respect to Kevin, the hearing
officer adopted plaintiff's proposed finding of fact which
stated: "The evidence reveals that Kevin's limitations on [sic]
strength, vitality or alertness due to lead poisoning adversely
affect[] Kevin's educational performance." In addition, as
evidenced by the hearing officer's granting of another of
plaintiff's proposed findings of fact, the hearing officer found
that the District's issuance of a Section 504 plan to address
Kevin's educational deficits provided evidence that Kevin's lead
poisoning has had an impact on his educational performance.

Notwithstanding the hearing officer's finding that Kevin's
lead poisoning adversely affects his education, he refused to
rule that Kevin has a qualifying disability. The hearing officer
reasoned that there was "an insufficient discrepancy between
[Kevin's] ability and his achievement to require the District to
code [him as OHI] against their [sic] wishes." (Hearing Officer's
Order at 14 (emphasis added)).

The hearing officer reached a similar decision with respect
to Kristeen. The hearing officer adopted plaintiff's proposed
finding of fact which stated: "The evidence reveals that

-22-

Kristeen's limitations on [sic] strength, vitality or alertness due to lead poisoning adversely affect[] Kristeen's educational performance."  In addition, the hearing officer found that the District's issuance of a Section 504 plan to address Kristeen's educational deficits as well as the District's provision of specialized reading services to her provided evidence that Kristeen's lead poisoning has had an impact on her educational performance.

Despite finding that Kristeen's lead poisoning adversely affects her education, the hearing officer refused to rule that Kristeen has a qualifying disability.  The hearing officer reasoned that there was "an insufficiently adverse impact on [Kristeen's] performance at this measuring point" to code her as OHI.  (Hearing Officer's Order at 10 (emphasis added)).

The hearing officer erred, however, when he read a sufficiency test into the "adversely affects" language of the OHI regulation.  A review of the case law reveals that courts do not ordinarily read such a requirement into the "adversely affects" language of the IDEA regulations absent a requirement in a particular regulation that imposes such a test.  Compare Doe v. Belleville Pub. Sch. Dist., 672 F. Supp. 342, 345 (S.D. Ill. 1987) (court did not use sufficiency test in applying "adversely affects" language of OHI regulation), with In re a Child with Disabilities, 19 IDELR 198, 199-203 (SEA Conn. 1992) (court used sufficiency test in applying language of serious emotional disturbance regulation because regulation requires showing of

sufficient impact). Because the OHI regulation does not impose a sufficiency test on the process of reviewing whether a student's impairment adversely affects her educational performance, see 34 C.F.R. § 300.7(b)(8); N.H. Code Admin. R. Ed. 1102.31(i), I find that the hearing officer's use of such a test in the instant case was improper.

In reaching the opposite conclusion, the hearing officer relied on several cases that, upon review, are inapposite to the issue at hand. A number of the cases that the hearing officer relied upon simply do not offer the support alleged. For instance, in Belleville Public School District, the plaintiff, a student with AIDS, asked the court to find that his disease adversely affected his educational performance. 672 F. Supp. at 345. The court, nevertheless, affirmed the hearing officer's determination that the student's impairment was not a qualifying disability. See id. The court did not do so on the basis that the student's impairment did not significantly impact the student's educational performance. Rather, the court held that because the student was able to do the required work without any specialized instruction, the student's diagnosis with AIDS did not have any adverse effect on his educational performance. See id.; see also In re Christopher D., 1986-87 Educ. for the Handicapped Law Rep. ("EHLR") Dec. 508:124, 126 (SEA Ind. 1986) (court did not use significant impact test in determining whether student's allergies adversely affect his educational performance under the OHI regulation so as to constitute a qualifying

-24-

disability); <u>Catoosa County Bd. of Educ.</u>, 20 IDELR 729, 730-31 (SEA Ga. 1993) (court did not use significant impact test in determining whether student's speech impairment and attention deficit disorder adversely affect his educational performance under the "speech or language impairment" and OHI regulations so as to constitute a qualifying disability).

Other cases that the hearing officer cited are inapposite because they apply a regulation that expressly imposes a significant impact test on the process of reviewing whether a student's impairment adversely affects her educational performance. In <u>In re a Child with Disabilities</u>, for example, the plaintiff, an academically gifted fifth grade student with an alleged serious emotional disturbance, asked the hearing officer to find that his impairment adversely affected his educational performance. <u>See</u> 19 IDELR at 199. The hearing officer, however, determined that the student's impairment was not a qualifying disability. <u>See</u> <u>id.</u> at 203. In making this determination, the hearing officer did look to whether the student's impairment significantly impacted the student's educational performance. <u>See</u> <u>id.</u> Yet, the hearing officer did so only because both the federal and state regulations defining "serious emotional disturbance" require a showing of sufficient impact. <u>See</u> 34 C.F.R. § 300.7(b)(9)(i) ("The term ['serious emotional disturbance'] means a condition exhibiting one or more of the following characteristics over a long period of time and to a <u>marked degree</u> that adversely affects a child's educational

-25-

performance. . . ." (emphasis added)); Conn. Agencies Regs. § 10-76a-2(m) (1997) (same).

Here, the regulation defining "other health impairment" does not impose a significant impact test on the process of reviewing whether a student's impairment adversely affects her educational performance. See 34 C.F.R. § 300.7(b)(8); N.H. Code Admin. R. Ed. 1102.31(i). Thus, the hearing officer erred when he determined that plaintiffs do not have a qualifying disability on the basis that plaintiffs' impairments do not significantly impact their educational performance. Consequently, I cannot affirm the hearing officer's conclusions on this basis and must make my own determination, using the correct legal standard, as to whether plaintiffs' impairments adversely affect their educational performance.

2.    Do Plaintiffs' Impairments Adversely Affect Their
       Educational Performance?

Although the regulation defining the OHI category requires that a child's impairment adversely affect the child's educational performance, the regulation does not elaborate on what is meant by adversely affecting performance. See Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1375 (8th Cir. 1996) ("Yankton II"); Mary P. v. Illinois State Bd. of Educ., 919 F. Supp. 1173, 1178 (N.D. Ill. 1996); 34 C.F.R. § 300.7(b)(8); N.H. Code Admin. R. Ed. 1102.31(i). A survey of the case law in which courts and hearing officers have applied such language, however, reveals that adjudicative bodies have adopted a consistent approach in determining whether a child is adversely affected by

a categorically defined impairment.

Courts and the United States Department of Education's Office of Special Education Programs ("OSEP")[10] routinely find that an impairment adversely affects a child's educational performance where, but for the specialized instruction the child is receiving, the child would not be able to do the required class work.[11] See, e.g., Yankton II, 93 F.3d at 1375 (student's orthopedic impairment adversely affects her educational performance where the impairment would prevent her from achieving academic success but for the personalized instruction and supplementary services she receives); Mary P., 919 F. Supp. at 1180-81 (student's speech impairment adversely affects his educational performance where the impairment will inhibit his ability and desire to communicate in the classroom unless he receives special education services); Conrad Weiser Area Sch.

---

[10] The Department of Education recently changed OSEP's name to the Office of Special Education and Rehabilitative Services.

[11] My holding today is in no way meant to impose a requirement on school districts to provide each child who qualifies for Section 504 services, see supra note 3, with an IEP pursuant to the IDEA. Because of the different standards of eligibility associated with each statute, not every child receiving services under Section 504 will have an impairment as defined by IDEA regulation 34 C.F.R. § 300.7(b). For instance, a student with an emotional disturbance may be eligible for Section 504 services because of the disruption his emotional disturbance causes to one of his life activities. Yet, if the student is able to do the required class work despite his impairment as evidenced by the student's lack of need for specialized instruction, the student would be ineligible for IDEA services. See, e.g., In re a Child with Disabilities, 19 IDELR at 203 (student with emotional disturbance found eligible for Section 504 services but not IDEA services because disturbance did not interfere with student's ability to do the required class work).

Dist. v. Department of Educ., 603 A.2d 701, 705 (Pa. Commw. Ct. 1992) (student's specific learning disability adversely affects his educational performance where the impairment would prevent him from achieving academic success in the classroom but for the supplementary services he receives); Letter to Pawlisch, 24 IDELR 959 (OSEP 1996) (in determining whether student's impairment adversely affects her educational performance, school district must assess whether impairment would prevent her from achieving academic success in the classroom but for the supplementary services she is already receiving).

Conversely, courts find that an impairment does not adversely affect a child's educational performance where the child is able to do the required class work without specialized instruction. See, e.g., Doe v. Board of Educ., 753 F. Supp. 65, 70 (D. Conn. 1990) (student's emotional difficulties do not adversely affect his educational performance because student is able to do required work without any specialized instruction); Hiller v. Board of Educ., 743 F. Supp. 958, 960-61 (N.D.N.Y. 1990) (student's weak attention span does not adversely affect his educational performance because student is able to do required work without any specialized instruction); Belleville Pub. Sch. Dist., 672 F. Supp. at 345 (student's diagnosis with AIDS does not adversely affect his educational performance because student is able to do required work without any specialized instruction).

A child receives specialized instruction not only where the child's teacher modifies the content of the curriculum but also where the teacher modifies the techniques she uses to instruct the child in the regular curriculum. In Yankton II, for example, the court found that where the student, who suffered from cerebral palsy, was instructed in one-handed typing, was allowed to turn in shorter versions of assignments, and was provided with multiple copies of books, the student received specialized instruction. 93 F.3d at 1375; see also Mary P., 919 F. Supp. at 1180-81 (speech therapy that allows student to participate in classroom discussions constitutes specialized instruction); Conrad Weiser Area Sch. Dist., 603 A.2d at 705 (modifications to how student with written expression impairment completes written work constitutes specialized instruction).

In the instant case, the evidence in the record illustrates that but for the modifications to how Kevin and Kristeen were instructed, the children would not have been able to do the class work required of them. With respect to Kevin, the record reveals that in first grade, he had difficulty completing assignments; difficulty interacting with peers; specific language skill deficiencies; and was easily fatigued. As a result, Kevin required a high degree of attention from his teacher Jennifer Kusnarowis. Concerned with Kevin's performance, Kusnarowis authored a Section 504 plan, containing classroom modifications aimed at helping Kevin with his organizational, social, and language difficulties.

Despite such extra attention, by the middle of first grade, Kevin's teacher identified him as being at risk for failing first grade. Further, in March 1996, Kusnarowis noted that Kevin still remained below grade level in most academic areas. Finally, Kevin's first grade report card reveals that even at the end of the year he needed extra help in almost every subject to avoid failing and to be promoted to the second grade. (Hearing Officer's Order at 6.) Thus, the evidence illustrates that without the extra attention Kevin received from Kusnarowis, Kevin would not have been able to complete the first grade curriculum. Consequently, because he would not have been able to do the class work required of him without modified instruction, I find that a preponderance of the evidence supports the conclusion that Kevin's impairments adversely affect his educational performance. See Yankton II, 93 F.3d at 1375.

With respect to Kristeen, the record reveals that she entered first grade with skills considerably below her age level in the areas of receptive and expressive language and auditory memory. In addition, Kristeen was often lethargic and had difficulty completing her assignments. Consequently, during first grade, Kristeen received specialized reading services as well as "a great deal of extra encouragement, support with directions, and one-to-one instruction" from her teacher Nancy Marden.

Notwithstanding the support with which Kristeen had been provided, by the middle of first grade, her teacher noted

-30-

Kristeen's language and math skills remained areas of concern and that "due to Kristeen's level of achievement she should be considered at risk of not successfully completing the first grade program in one year."  In addition, Marden recorded the increased difficulty Kristeen was experiencing in completing her work as the school work became more complex.  Finally, Kristeen's first grade report card reveals that she needed extra help with such skills as working carefully; listening (including listening with understanding and following directions); language arts (including speaking, writing, and penmanship); and math (understanding concepts).  Thus, the evidence illustrates that without the reading services and extra attention Kristeen received from Marden, Kristeen would not have been able to complete the first grade curriculum.

The record shows that in second grade, Kristeen again required extra attention to succeed.  Her report card for the first half of the academic year reveals that she needed extra help in each quarter with her social learning skills (including organizing and completing tasks on time, and demonstrating responsibility for completing homework) and with her listening skills (including listening attentively and listening with understanding).  Concerned with Kristeen's performance, her teacher Lynn Bouchard authored a Section 504 plan, containing classroom modifications aimed at helping Kristeen with these skill areas.

Despite the extra help Kristeen received, Bouchard remained concerned about Kristeen's social learning and listening skills throughout the year. During the first half of the academic year, Bouchard noted that Kristeen's failure to hand in homework was an area of concern and that she "continued to have a tough time focusing and getting her work done." At mid-academic year, Kristeen's teacher observed that Kristeen's listening skills -- especially when directions were being given -- and organizational skills remained areas of concern. In March 1996, Bouchard again expressed concern over Kristeen's failure to hand in homework and her fatigue in class. Even at the end of the academic year, Bouchard remained concerned about Kristeen's social learning and listening skills.

Because with modified instruction Kristeen was "progressing in all subject areas," however, Bouchard promoted Kristeen to the third grade. Thus, the evidence illustrates that without the extra attention Kristeen received from Bouchard, Kristeen would not have been able to complete the second grade curriculum. Consequently, because she would not have been able to do the class work required of her without modified instruction, I find that a preponderance of the evidence supports the conclusion that Kristeen's impairments adversely affect her educational performance. See Yankton II, 93 F.3d at 1375.

**B.    Do Plaintiffs Need Special Education Because of Their Qualifying Disability?**

Plaintiffs next assert that because they have a qualifying

disability, they need the special education and educationally related services available under the IDEA.

At the due process hearing, the District argued, and the hearing officer agreed, that because plaintiffs are progressing from grade to grade, they do not need special education under the IDEA. With respect to Kevin, the hearing officer adopted the District's opinion that despite receiving modified classroom instruction, Kevin did not need special education because he was "performing within a reasonable range of his peers" and, therefore, making appropriate educational progress. The hearing officer reached a similar decision with respect to Kristeen, namely that despite receiving modified classroom instruction, Kristeen does not "'need' special education or educationally related services" because she is making "appropriate educational progress."

The hearing officer erred, however, in applying a standard that looked solely to whether plaintiffs were progressing from grade to grade instead of one that looked to whether plaintiffs needed individualized instruction to meet the needs created by their qualifying disability. See, e.g., Yankton II, 93 F.3d at 1374-75 (where issue is whether student needs special education, standard is whether student needs individualized instruction to do required class work); Mary P., 919 F. Supp. at 1180-81 (same).

While many IDEA cases do look to whether the child is passing from grade to grade pursuant to the mandate set forth in Rowley, 458 U.S. at 203-04, the standard set forth in Rowley is

not applicable to the case at hand.  See Yankton II, 93 F.3d at 1374-75; Mary P., 919 F. Supp. at 1180-81.  For example, in Rowley, the plaintiff, a hearing-impaired student, asked the Supreme Court to determine whether she was entitled to an in-class sign language interpreter in addition to the IDEA services she was already receiving.  485 U.S. at 185-86.  Thus, the issue in Rowley concerned what quality of services a school district owed an already IDEA eligible student.  See id. at 185-87, 200.  In resolving the issue, the Court held that the IDEA set a floor beneath which the quality of services offered to the student could not slip but did not guarantee the student would receive all the services that she needed to maximize her educational potential.  See id. at 198-200.  To determine whether the district was providing the minimum services necessary, the Court held that the appropriate standard was whether the student was achieving the minimum goals set by the curriculum or, in other words, whether the student was passing from grade to grade.  See id. at 203-04.  If the student was passing from grade to grade, then the school was providing the minimum quality of services.

In the instant case, however, the hearing officer was not being asked to determine what type of services the District owed to an already eligible student in order to provide that student with a free and appropriate public education.  Instead, the issue here is whether plaintiffs are eligible to receive any IDEA services at all.  In such an eligibility determination, a standard that assesses whether plaintiffs are passing from grade

-34-

to grade with the services being provided is not informative. See <u>Yankton II</u>, 93 F.3d at 1374-75; <u>Mary P.</u>, 919 F. Supp. at 1180-81; <u>see also</u> <u>Letter to Pawlisch</u>, 24 IDELR 959 (advising that school districts should avoid denying a child IDEA services simply on the basis that the child is passing from grade to grade with some services already provided).  Rather, the appropriate standard for an eligibility determination at a minimum looks to whether plaintiffs require any special education or related services in order to pass from grade to grade.[12]  See <u>Yankton II</u>, 93 F.3d at 1374-75; <u>Mary P.</u>, 919 F. Supp. at 1180-81; <u>see also</u> <u>Letter to Pawlisch</u>, 24 IDELR 959 (where a child with an alleged learning disability is passing from grade to grade with some services already provided, in determining whether the child needs

---

[12]  Neither the IDEA nor its implementing regulations attempt to set forth a test for determining whether a child with a listed impairment or a specific learning disability "needs" specialized education or related services.  Some courts that have addressed the question have concluded that a need exists within the meaning of the IDEA whenever specialized education or related services are required to meet the unique educational needs resulting from a student's impairment.  <u>See</u> <u>Yankton Sch. Dist. v. Schramm</u>, 900 F. Supp. 1182, 1190 (D.S.D. 1995) ("Yakton I"), <u>aff'd</u>, <u>Yankton II</u>, 93 F.3d at 1374-75; <u>Letter to Pawlisch</u>, 24 IDELR 959.  Using this standard, a child might be deemed to "need" special education and related services even if the child were able to achieve passing marks without such services.  <u>See, e.g.</u>, <u>Yakton I</u>, 900 F. Supp. at 1190.
An alternative conception of the need requirement would focus on the disabled student's right to a "free and appropriate public education" and hold that an impaired student needs special education or related services only when such education or services would be required in order for the student "to achieve passing marks and advance from grade to grade" if the child were placed in a regular classroom.  <u>See</u> <u>Rowley</u>, 485 U.S. at 204 (discussing IDEA's free and appropriate education requirement).  I need not precisely define the IDEA's need requirement in this case because plaintiffs are entitled to prevail under either definition.

IDEA services, the school district should evaluate whether the child is passing because of the services she already receives). But see Wayne Highlands Sch. Dist., 24 IDELR 476, 478 (SEA Pa. 1996).[13]

The hearing officer in these cases erred when he determined that plaintiffs did not need special education based on an assessment of whether plaintiffs were passing from grade to grade with the services provided instead of on an assessment of whether plaintiffs needed those services to pass from grade to grade. Further, as I have already found, both plaintiffs require special education services in order to pass from grade to grade. Consequently, they are each entitled to an IEP.[14]

## IV.   CONCLUSION

For the foregoing reasons, I deny the District's motions for summary judgment as to each child (Cv-96-485-B, document no. 16; and Cv-96-516-B, document no. 14), and find that, as a matter of law, the children are each entitled to be coded for an IEP to

---

[13]   To the extent that Wayne Highlands School District, 24 IDELR 476, reaches a different solution, I choose not to follow that case in that its reasoning is not supported by precedent and is unpersuasive.

[14]   Mindful of the admonition in Rowley that courts should not substitute "their own notions of sound educational policy for those of the school authorities which they review," 458 U.S. at 206, I do not offer any opinion regarding the nature of the IDEA services to which plaintiffs may be entitled.  Plaintiffs may not be entitled to any greater level of services than they currently are receiving in the classroom.  Nevertheless, they are entitled to have their needs evaluated in an IEP.

determine what special education and educationally related services they may require.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 5, 1998

cc: Craig L. Staples, Esq.
    Thomas F. Kehr, Esq.
    Diane Gorrow, Esq.
    Ann Larney, Esq.